upon the Project (a) to examine and inspect the Series A Project and the Series C Project without interference or prejudice to the Company's operations, (b) to perform such work in and about the Project made necessary by reason of the Company's default under any of the provisions of this Management Agreement, and (c) to exhibit the Project to prospective users, purchasers, lessees or trustees subsequent to an Event of Default.

**Section 10.4.  Depreciation, Investment Tax Credit and Other Tax Benefits.**  The City agrees that any depreciation, investment tax credit or any other tax benefits with respect to the Project or any part thereof shall be made available to the Company, and the City will fully cooperate with the Company in any effort by the Company to avail itself of any such depreciation, investment tax credit or other tax benefits.

**Section 10.5.  Company to Maintain Existence.**  The Company agrees that until the Bonds are paid in full or payment in full is provided for in accordance with the terms of the Indenture, the Company will maintain the Company's existence, and will not dissolve or otherwise dispose of all or substantially all of the Company's assets; *provided, however,* that the Company may, without violating the agreement contained in this Section 10.5, either (i) assign, transfer, encumber or dispose of this Management Agreement in accordance with Section 13.1 of this Management Agreement; or (ii) consolidate with or merge into another person or entity or permit one or more other persons or entities to consolidate with or merge into the Company, or may sell or otherwise transfer to another person or entity all or substantially all of the Company's assets as an entirety and thereafter dissolve; *provided, however*, the surviving, resulting or transferee entity: (a) expressly assumes in writing all the obligations of the Company contained in this Management Agreement, and (b): such entity is controlled by, under common control with or controls the Company.

**Section 10.6. Environmental Matters, Warranties, Covenants and Indemnities Regarding Environmental Matters.**

(a)      During the Term, the Company shall provide the City and the Trustee with copies of any notifications of releases of Hazardous Substances or of any environmental hazards or potential hazards which are given by or on behalf of the Company (or any sublessee thereof) to any federal, state or local or other agencies or authorities or which are received by the Company (or any sublessee thereof) from any federal, state or local or other agencies or authorities with respect to the Project.  Such copies shall be sent to the City and the Trustee concurrently with their being mailed or delivered to the governmental agencies or authorities or within ten (10) days after they are made or received by the Company (or any sublessee thereof).

(b)      The Company shall comply with and operate and at all times use, keep and maintain the Project and every part thereof (whether or not such property constitutes a facility, as defined in 42 U.S.C. § 9601 *et. seq.*) in material conformance with all applicable Environmental Laws. Without limiting the generality of the foregoing, the Company will not use, generate, treat, store, dispose of or otherwise introduce any Hazardous Substance into or on the Property or the Project or

any part thereof nor cause, suffer, allow or permit anyone else to do so except in compliance with all applicable Environmental Laws.

Section 10.7. **Continuing Disclosure Agreement.** The Company covenants and agrees to execute and deliver the Continuing Disclosure Agreement, or a similar undertaking, which in the opinion of Bond Counsel will satisfy Rule 15c2-12 promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934 (17 C.F.R. § 240.15c2-12) (as in effect and interpreted from time to time, the "Rule"), and will observe and perform the covenants and agreements contained therein, unless amended or terminated in accordance with the provisions thereof, for the benefit of the Bondowners or beneficial owners from time to time of the Outstanding Bonds as therein provided. Notwithstanding any other provision of this Management Agreement, the failure of the Company to comply with the continuing disclosure agreement or similar undertaking shall not be considered an Event of Default under this Management Agreement or under the Indenture.

# ARTICLE XI
# OPTION AND OBLIGATION TO PURCHASE THE PROJECT

Section 11.1. **Option and Obligation to Purchase.**

(a) Provided that the Company is not in default under this Management Agreement, the Company shall have the option to purchase the Project at any time prior to the expiration of the Term at a purchase price equal to the sum of the following:

(i) an amount of money which, when added to the amount then on deposit in the Bond Funds, and the Debt Service Reserve Funds will be sufficient to redeem all the then Outstanding Bonds on the earliest redemption date as determined in accordance with Article III of the Indenture next succeeding the closing date of the purchase, including, without limitation, principal and interest to accrue to said redemption date and redemption expense; plus

(ii) an amount of money equal to the Trustee's agreed to fees and expenses under the Indenture accrued and to accrue until redemption of the Bonds; plus

(iii) the sum of $5,000.00.

(b) On the expiration or termination of the Term or the redemption of the Bonds pursuant to Article III of the Indenture, the Company shall have the obligation to purchase and the City shall have the obligation to sell the Project for a purchase price equal to:

(i) the fair market value of the Project as of the date of expiration of the Term or the earliest redemption date as determined in accordance with Article III of the Indenture, which amount shall in no event be less than: (i) the total principal amount of the Bonds issued, less (ii) the principal amount of the Bonds theretofore redeemed

pursuant to Section 301 of the Indenture plus the principal amount of the Bonds theretofore repaid, and defeased; plus

(ii) the sum of $10,000.00.

**Section 11.2. Conveyance and Transfer.** At the closing of the purchase of the Project pursuant to this Article XI, the City will, upon receipt of the purchase price, deliver or cause to be delivered to the Company the following:

(a) A release of the Project from the lien and/or security interest of the Financing Agreement and this Management Agreement; and

(b) Documents conveying to the Company legal title to the Project, as it then exists, subject to the following: (i) those liens and encumbrances, if any, to which title to the Project was subject when acquired by and conveyed to the City; (ii) Permitted Encumbrances; (iii) those liens and encumbrances resulting from the failure of the Company to perform or observe any of the agreements of the Company contained in this Management Agreement; and (iv) if the Project or any part thereof is being condemned, the rights and title of any condemning authority.

## ARTICLE XII
## DEFAULTS AND REMEDIES

**Section 12.1. Events of Default.** If any one or more of the following events shall occur and be continuing, it is hereby defined as and declared to be and to constitute an "Event of Default" or "default" under this Management Agreement:

(a) Default in (i) the due and punctual payment of any Basic Payment; or (ii) the due and punctual payment of any Additional Payment, and such default, in the case of an Additional Payment, shall continue for 10 days after the City or the Trustee has given the Company written notice specifying such default; or

(b) Default in the due observance or performance of any other covenant, agreement, obligation or provision of this Management Agreement or of the Development Agreement on the Company's part to be observed or performed (including, without limitation, timely making of payments in lieu of taxes under Section 4.2 of the Development Agreement), and such default shall continue for sixty (60) days after the City or the Trustee has given the Company written notice specifying such default (or such longer period as shall be reasonably required to cure such default; provided that (i) the Company has commenced such cure within said 60-day period, and (ii) the Company diligently prosecutes such cure to completion); or

(c) The Company shall: (i) admit in writing the Company's inability to pay the Company's debts as they become due; or (ii) file a petition in bankruptcy or for

reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the United States bankruptcy code as now or in the future amended or any other similar present or future federal or state statute or regulation, or file a pleading asking for such relief; or (iii) make an assignment for the benefit of creditors; or (iv) consent to the appointment of a trustee, receiver or liquidator for all or a major portion of the Company's property or shall fail to have the appointment of any trustee, receiver or liquidator made without the Company's consent or acquiescence, vacated or set aside; or (v) be finally adjudicated as bankrupt or insolvent under any federal or state law; or (vi) be subject to any proceeding, or suffer the entry of a final and non-appealable court order, under any federal or state law appointing a trustee, receiver or liquidator for all or a major part of the Company's property or ordering the winding-up or liquidation of the Company's affairs, or approving a petition filed against the Company under the United States bankruptcy code, as now or in the future amended, which order or proceeding, if not consented to by the Company, shall not be dismissed, vacated, denied, set aside or stayed within 90 days after the day of entry or commencement; or (vii) suffer a writ or warrant of attachment or any similar process to be issued by any court against all or any substantial portion of the Company's property, and such writ or warrant of attachment or any similar process is not contested, stayed, or is not released within sixty (60) days after the final entry, or levy or after any contest is finally adjudicated or any stay is vacated or set aside; or

(d) The Company shall vacate or abandon the Project or any substantial portion thereof; or

(e) The Company shall fail to (i) pay amounts due from the Company under the Development Agreement or (ii) comply with the other material terms of the Development Agreement applicable to the Company, and such default shall continue for sixty (60) days after the City, or any other party to the Development Agreement has given the Company written notice specifying such default (or such longer period as shall be reasonably required to cure such default; provided that (A) the Company has commenced such cure within such 60-day period, and (B) the Company diligently prosecutes such cure to completion.

**Section 12.2. Remedies on Default.** If any Event of Default referred to in Section 12.1 of this Management Agreement shall have occurred and be continuing, then the City may at the City's election, then or at any time thereafter, and while such default shall continue, take any one or more of the following actions:

(a) cause all amounts payable with respect to the Basic Payments for the remainder of the Term to become immediately due and payable;

(b) give the Company written notice of intention to terminate this Management Agreement on a date specified therein, which date shall not be earlier than sixty (60) days after such notice is given, and if all defaults have not then been cured, on the date so specified, the Company's rights to use the Project shall cease and this Management Agreement shall thereupon be terminated,

*provided that* none of the foregoing shall in any manner diminish the City's rights against the Company and otherwise pursuant to the Guaranty and the Escrow Agreement; or

(c) without terminating this Management Agreement, enter the Project and take possession thereof pursuant to applicable legal proceedings or pursuant to any notice provided for by law, and having elected to re-enter the Project without terminating this Management Agreement, the City shall use reasonable diligence to obtain a substitute or successor user for the Project, or parts thereof, for such term or terms and upon such other terms and conditions as the City may deem advisable, with the right to make alterations and repairs to the Project, and no such entry and taking of possession by the City shall be construed as an election on the City's part to terminate this Management Agreement, and no such entry and taking of possession by the City shall relieve the Company of the Company's obligation to pay Basic Payments or Additional Payments (at the time or times provided herein), or any of the Company's other obligations under this Management Agreement, all of which shall survive such entry and taking of possession, and the Company shall continue to pay the Basic Payments and Additional Payments provided for in this Management Agreement until the end of the Term, whether or not a substitute user for the Project shall have been obtained, including, without limitation, City's reasonable expenses in or in connection therewith all repossession costs, brokerage commissions, legal expenses, expenses of employees, expenses, alteration costs and expenses of preparation for reuse. Having elected to enter the Project and take possession thereof without terminating this Management Agreement, the City may, by notice to the Company given at any time thereafter while the Company is in default in the payment of Basic Payments or Additional Payments or in the performance of any other obligation under this Management Agreement, elect to terminate this Management Agreement on a date to be specified in such notice, which date shall be not earlier than 30 days after such entry, and if all defaults shall not have then been cured, on the date so specified this Management Agreement shall thereupon be terminated. If in accordance with any of the foregoing provisions of this Article XII the City shall have the right to elect to enter the Project and take possession thereof, the City may enter without being guilty of any manner of trespass and without prejudice to any remedies for arrears of rent or preceding breach of covenant. The City may take whatever action at law or in equity which may appear necessary or desirable to collect payments then due and thereafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Company under this Management Agreement.

Section 12.3. **Survival of Obligations.** The Company covenants and agrees with the City and Bondowner that the Company's obligations under this Management Agreement shall survive the cancellation and termination of this Management Agreement, for any cause, and that the Company shall continue to pay the Basic Payments and Additional Payments and perform all other obligations provided for in this Management Agreement, all at the time or times provided in this Management Agreement; provided, however, that upon the payment of all Basic Payments and Additional Payments under Article V of this Management Agreement, and upon the satisfaction and discharge of the Indenture under Section 1301 thereof, the Company's obligation under this Management Agreement shall thereupon cease and terminate in full.

Section 12.4.  **Rights and Remedies Cumulative.**  The rights and remedies reserved by the City and the Company hereunder and those provided by law shall be construed as cumulative and continuing rights.  No one of them shall be exhausted by the exercise thereof on one or more occasions.  The City and the Company shall each be entitled to specific performance and injunctive or other equitable relief for any breach or threatened breach of any of the provisions of this Management Agreement, notwithstanding availability of an adequate remedy at law, and each party hereby waives the right to raise such defense in any proceeding in equity.

Section 12.5.  **Waiver of Breach.**  No waiver of any breach of any covenant or agreement contained in this Management Agreement shall operate as a waiver of any subsequent breach of the same covenant or agreement or as a waiver of any breach of any other covenant or agreement, and in case of a breach by the Company of any covenant, agreement or undertaking by the Company, the City may nevertheless accept from the Company any payment or payments hereunder without in any way waiving City's right to exercise any of the City's rights and remedies provided for in this Management Agreement with respect to any such default or defaults of the Company which were in existence at the time such payment or payments were accepted by the City.

Section 12.6.  **Performance of Company's Obligations.**  If the Company fails to keep or perform any of the Company's obligations as provided in this Management Agreement, then the City may (but shall not be obligated to) do upon the continuance of such failure on the Company's part for 15 days after notice of such failure is given to the Company by the City, and without waiving or releasing the Company from any obligation hereunder, as an additional but not exclusive remedy, make any such payment or perform any such obligation, and all sums so paid by the City and all necessary incidental costs and expenses incurred by the City in performing such obligations shall be paid to the City in accordance with Section 5.2 of this Management Agreement.

Section 12.7.  **Trustee's Exercise of the City's Remedies.**  Whenever any event of default shall have occurred and be continuing, the Trustee may, but except as otherwise provided in the Indenture shall not be obliged to, exercise any or all of the rights of the City under this Article XII, upon notice as required of the City unless the City has already given the required notice.  In addition, the Trustee shall have available to it all of the remedies prescribed by the Indenture.

ARTICLE XIII
ASSIGNMENT

Section 13.1.  **Assignment.**

(a)     Upon prior written consent of the City in its sole discretion, the Company shall have the right to assign, transfer, encumber or dispose of this Management Agreement or any interest therein or part thereof for any lawful purpose under the Act.  With respect to any such assignment, the Company shall comply with the following conditions:

(1)     Such assignment shall be in writing, duly executed and acknowledged by the assignor and in proper form for recording;

(2)     Such assignment shall include the entire then unexpired Term; and

(3)     A duplicate original of such assignment shall be delivered to the City and the Trustee within ten (10) days after the execution thereof, together with an assumption agreement, duly executed and acknowledged by the assignee in proper form for recording, by which the assignee shall assume all of the terms, covenants and conditions of this Management Agreement on the part of the Company to be performed and observed.

(b)     The City shall have the right to assign any interests in this Management Agreement without the prior consent of the Company.  Any assignee of all the rights of the City shall agree in writing to be bound by the terms of this Management Agreement, the Development Agreement and any other Bond Documents.

**Section 13.2.  Assignment of Revenues by City.**  The City may assign and pledge any revenues and receipts receivable under this Management Agreement, to the Trustee pursuant to the Indenture as security for payment of the principal of, interest and premium, if any, on the Bonds and the Company hereby consents to such pledge and assignment.

**Section 13.3.  Prohibition Against City's Mortgage of Project.**  The City shall not mortgage, assign or pledge the City's interest in the Project, other than to the Trustee pursuant to Section 13.2 of this Management Agreement.

**Section 13.4.  Restrictions on Sale or Encumbrance of Project by City.**  During the Term, and provided that the Company is not in default or has not received notice of an Event of Default hereunder, the City agrees that, except as to pledges of the City's interest in the Project, to the Trustee, the City will not sell, assign, encumber, mortgage, transfer or convey the Project or any interest therein.

## ARTICLE XIV
## AMENDMENTS, CHANGES AND MODIFICATIONS

**Section 14.1.  Amendments, Changes and Modifications.**  Except as otherwise provided in this Management Agreement or in the Indenture, subsequent to the issuance of the Bonds and prior to the payment in full of the Bonds (or provision for the payment thereof having been made in accordance with the provisions of the Indenture), this Management Agreement may not be effectively amended, changed, modified, altered or terminated without the prior written consent of the Trustee, which consent shall not be unreasonably withheld or delayed.

# ARTICLE XV
# MISCELLANEOUS PROVISIONS

**Section 15.1. Notices.** All notices, certificates or other communications required or desired to be given hereunder shall be in writing and shall be deemed duly given when (a) mailed by registered or certified mail, postage prepaid, or (b) sent by overnight delivery or other delivery service which requires written acknowledgment of receipt by the addressee, addressed as follows:

(i) To the City:  City of Moberly, Missouri
101 West Reed - City Hall
Moberly, Missouri  65270
Attn:  City Manager

With a copy to:  Cunningham, Vogel & Rost, P.C.
75 West Lockwood, Suite One
St. Louis, Missouri 63119
Attn:  Thomas A. Cunningham, Esq.

(ii) To the Company:  Mamtek U.S., Inc.
2121 Avenue of the Stars
Suite 2800
Los Angeles, California 90067
Attn:  CEO

With a copy to:  Steptoe & Johnson, LLP
2121 Avenue of the Stars
Suite 2800
Los Angeles, California 90067
Attn:  Steven E. Peden, Esq.

(iii) To the Trustee:  UMB Bank, N.A.
2 Broadway, Suite 435
St. Louis, Missouri 63102
Attn:  Corporate Trust Department

All notices given by certified or registered mail as aforesaid shall be deemed fully given as of the date they are so mailed. A duplicate copy of each notice, certificate or other communication given hereunder by either the City or the Company to the other shall also be given to the Authority and the Trustee pursuant to Section 1405 of the Indenture. The City, the Company and the Trustee may from time to time designate, by notice given hereunder to the others of such parties, such other address to which subsequent notices, certificates or other communications shall be sent.

**Section 15.2. Special Notice of Redemption of Bonds.** In the event the City wishes to redeem and defease the Bonds or any portion thereof pursuant to Article III of the Indenture

utilizing monies to be provided by the Company from any source, the City shall provide written notice to the Company of the City's intention to redeem such Bonds specifying the amounts to be provided by the Company at least one (1) year prior to the Redemption Date.

       **Section 15.3. Further Understandings and Obligations.** The parties hereto agree (a) that the Basic Payments are designed to provide the City and the Trustee funds adequate in amount to pay all principal of and interest accruing on the Bonds as the same become due and payable, (b) that to the extent that the Basic Payments are not sufficient to provide the City and the Trustee with funds sufficient for the purposes aforesaid, the Company shall be obligated to pay, and the Company does hereby covenant and agree to pay, upon demand therefor, as an Additional Payment, such further sums of money, in cash, as may from time to time be required for such purposes, and (c) that if after the principal of and interest on the Bonds and all costs incident to the payment of the Bonds (including the fees and expenses of the City and the Trustee) have been paid in full the Trustee or the City holds unexpended funds received in accordance with the terms hereof, such unexpended funds shall, after payment therefrom of all sums then due and owing by the Company under the terms of this Management Agreement, and except as otherwise provided in this Management Agreement and the Indenture, become the absolute property of and be paid over forthwith to the Company.

       **Section 15.4. No Pecuniary Liability.** No provision, covenant or agreement contained in this Management Agreement, the Indenture or the Bonds, or any obligation herein or therein imposed upon the City, or the breach thereof, shall constitute or give rise to or impose upon the City a pecuniary liability or a charge upon the general credit or taxing powers of the City or of the State or any political subdivision thereof.

       **Section 15.5. Conflicts with Development Agreement.** In regard to the respective responsibilities of the Company under this Management Agreement and under the Development Agreement, in the event of a conflict between the applicable terms of this Management Agreement and of the Development Agreement, the terms of the Development Agreement shall govern.

       **Section 15.6. Governing Law.** This Management Agreement and its performance shall be governed by and construed under the laws of the State of Missouri, without regard to choice or conflict of laws provisions. The parties hereto agree that any action at law, suit in equity, or other judicial proceeding arising out of this Management Agreement shall be instituted only in the Circuit Court of Randolph County, Missouri or in federal court of the Eastern District of Missouri and waive any objections based upon venue or *forum non conveniens* or otherwise.

       **Section 15.7. Binding Effect.** This Management Agreement shall be binding upon and shall inure to the benefit of the City and the Company and their respective successors and assigns.

       **Section 15.8. Severability.** If for any reason any provision of this Management Agreement shall be determined to be invalid or unenforceable, the validity and enforceability of the other provisions hereof shall not be affected thereby.

Section 15.9. **Execution in Counterparts.** This Management Agreement may be executed in several counterparts, each of which shall be deemed to be an original and all of which shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Management Agreement to be executed in their respective names by their duly authorized signatories, all as of the date first above written.

CITY OF MOBERLY, MISSOURI

By: /s/ Bob Riley
    Mayor

(Seal)
ATTEST:

/s/ DK Galloway
City Clerk

ACKNOWLEDGMENT

STATE OF MISSOURI    )
                     ) SS.
COUNTY OF RANDOLPH )

BE IT REMEMBERED that on this 22 day of July, 2010, before me, the undersigned, a notary public in and for said county and state, came Bob Riley, Mayor of the **CITY OF MOBERLY, MISSOURI**, a city of the third class duly authorized, incorporated and existing under the Constitution and laws of the State of Missouri who being personally known to me to be the same person who executed, as such officer, the within instrument on behalf of said City, and such persons duly acknowledged the execution of the same to authorized by action of the City Council of the City and to be the free act and deed of said City.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the day and year last above written.

/s/ DK Galloway
Notary Public

My Commission Expires:

D. K. GALLOWAY
My Commission Expires
February 10, 2012
Randolph County
Commission #08382850

MAMTEK U.S., INC.

By: *[signature]*
Bruce A. Cole
CEO and Chairman of the Board

## ACKNOWLEDGMENT

STATE OF <u>CALIFORNIA</u>   )
                             ) SS.
COUNTY OF <u>LOS ANGELES</u> )

BE IT REMEMBERED, that on this <u>19TH</u> day of July, 2010, before me the undersigned, a Notary Public in and for the county and state aforesaid, came Bruce A. Cole, CEO and Chairman of the Board of **MAMTEK U.S., INC.**, a Delaware corporation duly authorized to do business in Missouri, who is personally known to me to be such officer, and who is personally known to me to be the same person who executed the within instrument on behalf of said corporation, and duly acknowledged the execution of the same to be duly authorized by action of the corporation's board of directors and to be the free act and deed of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the day and year last above written.

*Inez N. Brown*
Notary Public

My Commission Expires:



INEZ N. BROWN
Commission # 1748781
Notary Public - California
Los Angeles County
My Comm. Expires Jun 3, 2011

- 30 -
3. Management Agreement – Moberly IDA Annual Appropriation Bonds Series 2010

**EXHIBIT C**
**Page 34 of 39**

**EXHIBIT A**
**THE PROJECT**

## The Series A Project

| Item Category/Description | Estimated Cost |
|---|---|
| **1.000 General Conditions** | |
| Mobilization/Overhead | $89,000 |
| Engineering/Architecture | 300,000 |
| Performance Bond/Builder's Risk | 150,000 |
| Construction Financing/Costs of Issuance | 786,600 |
| Subtotal | **$1,325,600** |
| **2.000 Sitework** | |
| Testing | $15,000 |
| Site Grading | 349,200 |
| Subtotal | **$364,200** |
| **3.000 Concrete** | |
| Building Foundations | $130,700 |
| Subtotal | **$130,700** |
| **5.000 Steel** | |
| Miscellaneous | $20,000 |
| Subtotal | **$20,000** |
| **8.000 Door and Windows** | |
| Dock and Grade Doors | $30,000 |
| Subtotal | **$30,000** |
| **9.000 Finishes** | |
| Factory Finishes-Exposed Steel | $143,200 |
| Restrooms/Breakroom/Equipment Rooms | 70,000 |
| Subtotal | **$213,200** |
| **11.000 Equipment** | |
| Steam Generator | $225,000 |
| Subtotal | **$225,000** |
| **12.000 Furnishings** | |
| Office Cabinets/Desks/Work Surfaces | $50,000 |
| Warehouse Shelving/Lab Equipment/Materiel Handling | 275,000 |
| Subtotal | **$325,000** |
| **13.000 Special Construction** | |
| Pre-Engineered Metal Building Erection | $500,000 |
| Clean Room | 587,500 |
| Signage | 20,000 |
| Subtotal | **$1,107,000** |
| **15.000 Mechanical** | |
| Plumbing | $60,000 |
| HVAC | 824,200 |
| Fire Protection | 300,000 |
| Subtotal | **$1,184,200** |
| **16.000 Electrical** | |
| Lighting and Power Supply | $787,500 |
| Subtotal | **$787,500** |
| **GRAND TOTAL** | **$5,712,900** |

## EXHIBIT A cont'd.

### The Series B Project

| Item Category/Description | Estimated Cost |
|---|---:|
| **0.000 Offsite Improvements** | |
| Road Access Improvements | $760,000 |
| Water Main Improvements | 75,000 |
| Sanitary Sewerage Improvements | 50,000 |
| Storm Water Collection Improvements | 75,000 |
| Drainage/Erosion Control/Landscaping | 40,000 |
| Subtotal | $1,000,000 |
| **1.000 General Conditions** | |
| Mobilization/Overhead | $47,500 |
| Engineering/Architecture | 200,000 |
| Performance Bond/Builder's Risk | 100,000 |
| Construction Financing/Costs of Issuance | 68,400 |
| Subtotal | $415,900 |
| **2.000 Sitework** | |
| Testing | $10,000 |
| Site Grading | 232,800 |
| Site Pavement | 775,800 |
| Curb and Gutter | 100,000 |
| Site Storm Drainage | 30,000 |
| Site Water | 7,500 |
| Site Sewer | 6,000 |
| Erosion Control | 2,000 |
| Landscaping/Beautification | 20,000 |
| Subtotal | $1,084,100 |
| **GRAND TOTAL** | $2,600,000 |