# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **UMB BANK, N.A., as Trustee,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Case No. 4:11-cv-1925 |
| ) | |
| **Mamtek U.S., Inc., and** ) | |
| **Mamtek International,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## EMERGENCY MOTION FOR ORDER APPOINTING RECEIVER

Plaintiff UMB Bank, N.A., solely in its capacity as Trustee under the Indenture and Bond Documents described herein (the "Trustee" or "Plaintiff" or "UMB"), submits this Memorandum in Support of its Emergency Motion for Order Appointing Receiver.

### I.     INTRODUCTION

This action arises from Defendants Mamtek U.S., Inc.'s, ("Mamtek") and Mamtek International's ("International") (at times, collectively, "Defendants" or the "Mamtek Parties") conduct regarding assets and funds pledged to bondholders and due other creditors; default thereunder; abandonment of the Project which has negatively impacted the City of Moberly and its community; and Mamtek's instigation of a non-judicial proceeding in California which seeks removal of documents and evidence necessary to understand how the Project (which was to cost approximately $33 million to complete) was abandoned by Mamtek after using up all available funds, and with estimates (by Mamtek itself) that another $30 to $44.5 million may be needed to complete the Project.

Generally, International operated a sugar substitute manufacturing facility in China. In 2010, International attempted to expand into the United States. Under the direction of its president, Bruce Cole, Mamtek was formed as a Delaware corporation and sought to open a facility (the "Project" or the "Facility") in Moberly, Missouri (the "City"). In order to finance the construction of the Project, Mamtek relied on Bonds issued by the City. The City was induced into such bond issue by the promise of a substantial investment into the local economy and the prospect of over 600 jobs. Pursuant to the Bond Documents (hereinafter defined), the Trustee was to act as Indenture Trustee and Mamtek was to make biannual payments to the City. The Facility was never completed, and only two of the promised payments were ever made, one out of the Debt Service Reserve Fund.

Instead, Mamtek defaulted on its payment and other obligations and has now ceased operations. Mamtek subsequently engaged a liquidation company to take over its corporate governance and thereafter executed an assignment for the benefit of creditors under California law (the "Assignment"), assigning its assets to Development Specialists, Inc. ("DSI"). DSI now seeks to liquidate any remaining assets in a non-judicial proceeding away from the scrutiny of the multimillions of dollars of creditors that Mamtek has left high and dry in mid-Missouri. DSI has also demanded all of Mamtek's electronic information, including various computer and network assets. Such demand may be an attempt to shelter Mamtek and its officials from liability for wrongdoing. Distrust and concerns of mismanagement now exist regarding Mamtek. A receiver is needed to control and preserve any remaining assets for the benefit of the Trustee as the largest creditor under the Bond Documents and the millions of dollars of other creditors that Mamtek abandoned.

The Trustee incorporates by reference all of the statements and allegations made in its Verified Complaint.

## II. BACKGROUND

1. International is a company based in Hong Kong which operates a manufacturing facility producing sugar substitute, branded "Sweet O," in the Fujian Province of China.

2. International formed Mamtek as its United States affiliate solely for the purpose of expanding sugar substitute development within the United States.

3. In early 2010, International began exploring locations within the United States for development of a manufacturing facility.

4. Mamtek marketed the endeavor by promising substantial investment into local economies and the creation of over 600 jobs. The endeavor was marketed as fulfilling a niche as the only source of this type of sugar substitute in the United States with the ability to meet worldwide demand.

5. On July 9, 2010, officials formally announced that a project would be established in the City including the acquisition and improvement of real property and the construction and equipping of a facility for manufacturing and processing sugar substitute (the "Project").

6. The Project was to be owned by the City, but operated by Mamtek.

7. In order to finance the Project, including construction of the manufacturing facility, Mamtek relied heavily on state tax incentives and bonds issued by the City.

8. The State of Missouri awarded Mamtek $7.6 million in Missouri Quality Jobs Program tax credits and $6.8 million in Missouri BUILD program tax credits. The State also provided $2 million in Community Development Block Grant Industrial Infrastructure Program grant funds; $800,000 in funding for job training; and $368,000 for employment recruitment and referral services.

9. Additional funding was supported by bonds issued by the Industrial Development Authority of the City of Moberly (the "Authority") acting under Chapter 349 of the Revised Statues of Missouri with respect to the financing of the Project.

10. Ultimately, three series of bonds in the total amount of $39 million were issued by the Authority:

    a. Series 2010-A Taxable Annual Appropriation Capital Project Bonds in the amount of $8,440,000;

    b. Series 2010-B Tax-Exempt Annual Appropriation Capital Project Bonds in the amount of $3,025,000; and

    c. Series 2010-C Tax-Exempt Annual Appropriation Recovery Zone Facility Bonds in the amount of $27,535,000 (collectively, the "Bonds").

11. On or about July 1, 2010, among other documents, the following Project documents relating to the Mamtek Parties' obligations were entered into:

    a. Trust Indenture by and between UMB, as Indenture Trustee, the City, and the Authority;

    b. Financing Agreement by and between the City and the Authority;

    c. Management, Operating, and Purchase Agreement by and between the City and Mamtek;

    d. Guaranty Agreement by and among the City, on one hand, and Mamtek and International, on the other hand, as guarantors;

    e. Escrow Trust Agreement by and among the City, Mamtek, and UMB, as Escrow Agent; and

    f. Security Assignment by and between the City and UMB (collectively, the "Bond Documents").

The Bond Documents are the operative documents to establish the liability of the Mamtek Parties hereunder and the basis for the claims against them.

12. Pursuant to the Trust Indenture, a copy of which is attached as **Exhibit A**, the Authority pledged and assigned, among other things, all right, title, and interest in the Financing

Agreement and the Security (hereinafter defined) to UMB, as Indenture Trustee for the bondholders.  Pursuant to the Trust Indenture, the Authority assigned its enforcement rights under the Financing Agreement to UMB.  Trust Indenture § 807.

13. Pursuant to the Financing Agreement, a copy of which is attached as **Exhibit B**, the City agreed to make payments on account of the Bonds to UMB, as Trustee, for the benefit of the Authority.  Such payments were due fifteen days prior to each Interest Payment Date for the Bonds, which are specified as March 1 and September 1.  Under the Financing Agreement, the Authority again reiterated that it assigned all rights under the Financing Agreement pursuant to the Trust Indenture to UMB and further specified that UMB had the power to exercise all rights granted to the Authority under the Financing Agreement.  Financing Agreement §§ 4.5 and 7.6.  Further, the City assigned to UMB all rights it may have in enforcement of the Management Agreement or Guaranty, including the right to bring all such actions as may be necessary in UMB's judgment. Financing Agreement § 5.3(b).

14. The Management Agreement, a copy of which is attached as **Exhibit C**, provided that the City would make available to Mamtek the funds raised pursuant to the Bonds and would grant Mamtek the exclusive right to manage and operate the Project, in exchange for Mamtek's obligation to manage and operate the facility, including the provision of funds to the City for the repayment of the Bonds as payments are due.  Management Agreement Article 3. Accordingly, such payments were due on the first day of each month preceding the Interest Payment Date, or February 1 and August 1.

15. Under the Management Agreement, events of default include, but are not limited to:

      a.      Default in the punctual payment of any payment due which continues for 10 days after the City or the Trustee has given written notice of such default;

      b.      Mamtek's execution of an assignment for the benefit of creditors; and

      c.      Mamtek's abandonment of the Project, and the filing of liens against the Project.

Management Agreement § 8.4 and Article 12.

16. Upon an event of default, under the Management Agreement, the City, or UMB acting as Trustee pursuant to Section 5.3(b) of the Financing Agreement, may elect to cause all outstanding amounts to be immediately due and payable, give Mamtek written notice of the intent to terminate the Management Agreement at a specified date, or reenter the Project and thereafter elect to terminate the Management Agreement upon notice no less than 30 days following reentry. Management Agreement Article 12.

17. Under the Guaranty Agreement, a copy of which is attached as **Exhibit D**, the Mamtek Parties each guaranteed the timely and full payment of all payments due under the Management Agreement. To secure such payment, the Mamtek Parties pledged to the City all right, title, and interest in patents, trade secrets, and other intellectual property regarding the manufacturing process and operating information used in the Project as set forth more fully on Exhibit A to the Guaranty Agreement (the "Security"). Guaranty Agreement Exhibit A.

18. In order to protect the Mamtek Parties' confidentiality with respect to the Security described in the Guaranty Agreement, the Escrow Agreement, a copy of which is attached as **Exhibit E**, was executed to name UMB as escrow agent of the Security. UMB, as escrow agent, agreed to release the Security to the City only upon default by the Mamtek Parties in order to allow the City to continue operations of the Project. Escrow Agreement Article 2.

19. Pursuant to the Security Assignment, a copy of which is attached as **Exhibit F**, the City transferred and assigned to UMB all of the City's right, title, and interest in the Security under the Guaranty Agreement and Escrow Agreement.

20. Upon default by Mamtek under the Bond Documents, the City, and therefore UMB as assignee under the Security Agreement, is authorized to give notice and exercise rights with respect to the Security, including demanding release of the Security from UMB as the escrow agent. Guaranty Agreement § 6.2 and Escrow Agreement § 2.2.

21. On or about July 15, 2010, the Authority adopted Resolution 2010-02 approving the bond issues and the Bond Documents.

22. On or about July 15, 2010, the City Council of Moberly, Missouri, adopted Ordinance No. 8485 approving the Bond Documents.

23. Prior to the Closing Date, Mamtek allegedly engaged Ramwell Industrial, Inc., ("Ramwell") to perform substantial services with respect to the Project, including the design, acquisition and installation of five production lines (the "Alleged Ramwell Services").

24. Despite Mr. Cole's denial, upon information and belief, Ramwell may be wholly-owned or partially-owned by Mr. Cole. It is unclear whether Ramwell is a Hong Kong corporation or incorporated and/or registered to do business in the State of Missouri or the United States.

25. On July 21, 2011, prior to the Closing Date, Ramwell issued an invoice to Mamtek in the amount of $4,062,500 representing a deposit for the Alleged Ramwell Services (the "July Ramwell Invoice").

26. On or about July 24, 2010, construction with respect to the Project began in accordance with the Bond Documents.

27. On July 27, 2010, the Bond Issue closed (the "Closing Date").

28. On July 28, 2011, one day after the Closing Date, the July Ramwell Invoice was paid from the Bond Proceeds in the amount of $4,012,500 (it is unknown at this point why the July Ramwell Invoice was reduced by $50,000).

29. Between November 2010 - July 29, 2011 (which date was immediately before Mamtek's deadline to pay its $3.2 million bond payment to the City due under the Management Agreement), Ramwell was paid an additional $2,590,173 from the Bond Proceeds, for a total of $6,602,673 (the "Ramwell Payments").

30. Despite receiving millions in Bond Proceeds that Mamtek was given to pay vendors and reimburse expenses, it is unclear whether Ramwell performed the Alleged Ramwell Services, or ever performed any actual work on the Project or at the Facility.

31. Other vendors performed substantial work on the Project, for which they remain unpaid and for which mechanics' liens have been filed against the Project (all, collectively, the "Mechanic's Lien Claimants"):

    a. Faith Technologies, Inc.– $154,520.43

    b. Air Liquide Industrial US LP– $ unknown

    c. Sys-Tek, P.A.– $155,679.50

    d. Septagon Construction Company– $1,389,283.03

32. In addition to the Trustee and the Mechanic's Lien Claimants, City Bank and Trust Company of Moberly, Missouri (the "Bank") has sued Mamtek and the Authority for possession of a Chevrolet pickup and $19,080,09, plus interest, for Mamtek's purchase of a Chevrolet pickup (the "Chevrolet Claim").  Further, upon information and belief, Mamtek owes Frost Electric Supply Company ("Frost") in an unknown amount with respect to work performed on the Project (the "Frost Claim").

33. On or about August 1, 2011, Mamtek failed to pay its $3.2 million bond payment to the City due under the Management Agreement. As a result, the City failed to make its corresponding bond payment to UMB, as Indenture Trustee for the Authority, under the Financing Agreement on or about August 15, 2011.

34. On September 1, 2011, UMB filed a notice stating that the required bond payment was not made in accordance with the Bond Documents. A copy of the Notice is attached as **Exhibit G**. UMB drew the payment to the bondholders from the debt service reserve funds, pursuant to the Bond Documents.

35. Because no payments have been received with respect to the Bonds, the outstanding balances are as follows:

    a. Series 2010-A Taxable Annual Appropriation Capital Project Bonds in the amount of $6,260,000;

    b. Series 2010-B Tax-Exempt Annual Appropriation Capital Project Bonds in the original issuance amount of $3,025,000; and

    c. Series 2010-C Tax-Exempt Annual Appropriation Recovery Zone Facility Bonds in the original issuance amount of $27,535,000.

36. On or about September 1, 2011, Peter Kravitz ("Kravitz") was hired by Mamtek as President. Kravtiz is an attorney based in Los Angeles specializing in liquidation of financially distressed companies.

37. On September 2, 2011, the City provided written notice to Mamtek and International of the default under the Bond Documents.

38. Shortly after the default and change in management, Mamtek terminated its employees.

39. On September 8, 2011, UMB was notified by the Securities and Exchange Commission (the "SEC") that UMB would receive a subpoena regarding the Project. The

subpoena was received by UMB on September 9, 2011, requesting, among other things, information relating to Project requisitions. UMB was subsequently informed by the City that the SEC investigation had been ongoing for several months and that subpoenas had been received by the City and Mamtek.

40. On September 9, 2011, Kravitz opined that an additional $30 million would be needed to complete the Project and this was after already spending the $39 million which was to have completed the Project. Kravitz also claimed that the Project was viable and that Mamtek possessed significant valuable resources and intellectual property.

41. On September 14, 2011, Mamtek's acting plant manager for the Project stated that completion of the Project would cost an additional $44.5 million.  Mamtek's plant manager admitted that the Project had been badly mismanaged before he arrived at Mamtek. He further claimed that, although the Project is viable, relevant manufacturing patents had expired recently and, in his view, the escrowed intellectual property of Mamtek was of little value.

42. On September 16, 2011, the City received notice that the requested assurances required for forbearance would not be provided by Mamtek.  In response, the City and the Authority took action to secure the Project and began exploring successors to the Project.

43. On September 23, 2011, Missouri Attorney General Chris Koster announced that the Attorney General's office would begin an investigation of the Mamtek Parties, including providing assistance to Prosecuting Attorney Mike Fusselman and the Randolph County Prosecuting Attorney's Office.

44. On September 26, 2011 Mamtek executed a general assignment for the benefit of creditors, purportedly assigning its assets to Development Specialists, Inc., ("DSI") to be

liquidated and distributed to creditors in accordance with California law.  A copy of the General Assignment for the Benefit of Creditors (the "Assignment") is attached as **Exhibit H**.

45. On or about September 26, 2011, the Missouri Senate announced an investigation of the Mamtek Parties and the Project by the Senate Committee on Government Accountability.

46. On October 5, 2011, City provided written notice of its intent to reenter the Project pursuant to the Management Agreement.  The City also expressed its intent to terminate the Management Agreement on October 27, 2011, unless Mamtek cured existing defaults before that date.  A copy of the notice is attached as **Exhibit I**.

47. On October 26, 2011, counsel for DSI attempted to remove assets of Mamtek from Missouri, including laptops and e-mail.  See Letter from John D. Fiero dated October 26, 2011, attached as **Exhibit J**.

48. On or about October 27, 2011, the Missouri House of Representatives announced that the House Interim Committee on Government Oversight and Accountability would begin an investigation of the Mamtek Parties and the Project.

49. On October 27, 2011, the Management Agreement terminated in accordance with the terms thereof and the notice provided on October 5.  *See* **Exhibit I**.

50. In addition to amounts due to the Trustee, Mechanic's Lien Claimants, Frost and the Bank, discovery may bear out additional creditors that remain unpaid.  Discovery may further bear out that additional improper payments were made to Ramwell or other entities owned or controlled by Mr. Cole.

51. The Trustee, the Mechanic's Lien Claimants, and the Bank are all headquartered or otherwise have a presence in Missouri.

The Verified Complaint in the captioned proceeding matter states the following Counts: Count I– Breach of Contract by Mamtek; Count II– Breach of Guaranty Agreement by the Mamtek Parties; and Count III– Appointment of Receiver.  The captioned Motion seeks immediate, emergency relief regarding Count III.

## ARGUMENT

"The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993).[1]

> "Although there is no precise formula for determining when a receiver may be appointed, factors typically warranting appointment are a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm." *Id*. at 316-17.  Although it is clear that a receivership is not an end in itself, there is no doubt that a court of equity has the power to appoint a receiver when the appointment is "ancillary to some form of final relief which is appropriate for equity[ ]." *Gordon v. Washington*, 295 U.S. 30, 38 (1935).

Under the *Aviation* factors, the appointment of a receiver is warranted.

**Valid claims by the party seeking the appointment.**  The Trustee indisputably has valid claims.

**The probability that fraudulent conduct has occurred or will occur to frustrate those claims.**  Based on past actions as set forth herein, including but not limited to the default under the Bond Documents; the potentially improper payments to related entities; the

---

[1] *See also Myles v. Sapta*, 139 F.3d 912, 1998 WL 45494 (10th Cir. 1998) (citing and concurring with *Aviation Supply*). The applicable rule is Federal Rule of Civil Procedure 66, which provides as follows: These rules govern an action in which the appointment of a receiver is sought or a receiver sues or is sued. But the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule. An action in which a receiver has been appointed may be dismissed only by court order.  28 U.S.C. §§ 754 and 959 also apply to the appointment of a receiver.

Assignment entered into on September 26, 2011;[2] ongoing investigations by the SEC, Missouri Attorney General, and Missouri House of Representatives; and DSI's insistence on removing Mamtek's books and records from Missouri, it is probable that fraudulent conduct may have occurred, and that evidence of the fraud may be removed, concealed, or destroyed to frustrate that claim.

**Imminent danger that property will be concealed, lost, or diminished in value.** Again, based on Defendants' past actions, including the timing of the Assignment and DSI's current efforts to move Mamtek's books and records out of Missouri and away from the Trustee, the Mechanics' Lien Claimants, the Bank, and various law enforcement officials, this factor weighs heavily in favor of the appointment of a receiver.

**Inadequacy of legal remedies.**  Mamtek's suspicious conduct has irreparably harmed the City, the Trustee and the bondholders, the Mechanic's Lien Claimants, the Bank, Frost, and others.

**Lack of a less drastic equitable remedy.**  No remedy other than a receivership, including the Assignment, can protect the Trustee's interest from further harm.  The timing of the Assignment is an indication of fraud.  The Assignment was also a unilateral decision by Mamtek, without the benefit of any input from the Trustee, the largest creditor by far.  Further, the Assignment is a non-judicial proceeding occurring in California.  The matters and conduct of Mamtek described herein demand Court oversight in Missouri, which will only happen with the appointment of a receiver.

**Likelihood that appointing the receiver will do more good than harm.**  The Court's appointment of a receiver will do more good than harm, in that the Mamtek Parties' conduct

---

[2] An Assignment of this nature does not happen overnight, and it is unclear whether the Assignment was contemplated by Mamtek prior to or after the failure to make the August 15, 2011, bond payment of $3.2 million.

harms not only the Trustee and the bondholders, but Mamtek's other creditors, all of whom are either located in or have a presence in Missouri.  Justice must occur in Missouri, which Mamtek has acknowledged in the past under various provisions of the Bond Documents.  Further, if DSI is allowed to remove Mamtek's books and records from Missouri, this would frustrate current and ongoing investigations into the Mamtek Parties by the SEC, the Missouri Attorney General and the Missouri House of Representatives.

\*           \*           \*           \*           \*           \*

Plaintiff proposes that Bruce E. Strauss, Esq. be appointed as receiver for Mamtek.  Mr. Strauss is well-qualified and fully prepared to act as receiver for the business pursuant to the Order of this Court.  The receiver shall file with the Clerk of this Court a bond in an amount determined by the Court to assure his conscientious performance of the duties and responsibilities imposed by the Order.  Further, the cost of the receiver should be assessed and taxed as part of the costs of this action, and added to the amounts owed by Defendants to Plaintiff.

## CONCLUSION

For the reasons stated herein and based on all of the files, records, and proceedings herein, the Plaintiff respectfully requests the appointment of a receiver.

November 4, 2011

        Respectfully Submitted,

        SPENCER FANE BRITT & BROWNE LLP

        /s/ Douglas M. Weems

| | |
|---|---|
| Douglas M. Weems | EDMO #41162MO |
| Scott J. Goldstein | EDMO #28698MO |
| Lisa Epps Dade | EDMO #48544MO |
| Heather M. Morris | MO #63107 |

dweems@spencerfane.com
sgoldstein@spencerfane.com
leppsdade@spencerfane.com
hmorris@spencerfane.com
1000 Walnut Street, Suite 1400
Kansas City, MO  64106
(816) 474-8100
(816) 474-3216– Fax

And

1 North Brentwood Boulevard
Suite 1000
St. Louis, MO 63105-3925

ATTORNEYS FOR PLAINTIFF
UMB BANK, N.A., SOLELY IN ITS
CAPACITY AS TRUSTEE